IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NAVAJO TRANSITIONAL ENERGY COMPANY, LLC, | CV 22-146-BLG-SPW-KLD |
| Plaintiff, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| BNSF RAILWAY COMPANY, | |
| Defendant. | |

Before the Court is Defendant BNSF Railway Company's ("BNSF") Motion to Compel Arbitration and Dismiss all claims asserted by Plaintiff Navajo Transitional Energy Company, LLC ("NTEC") pursuant to the Federal Rules of Civil Procedure 12(b)(1) and (b)(6) and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. (Doc. 16). For the reasons discussed below, the Court recommends BNSF's motion to compel arbitration be granted and this matter be stayed pending arbitration pursuant to Section 3 of the FAA, 9 U.S.C. § 3.

## I.  **Background**

This dispute concerns rail transportation of sub-bituminous coal from the Spring Creek Mine ("Spring Creek") in Big Horn County, Montana, to Westshore Terminals ("Westshore") in Roberts Bank, British Columbia, for export sale to Japan and Korea. (Doc. 1, ¶¶ 10–12).

BNSF, a Class 1 railroad and the only rail carrier capable of providing single-line, direct coal transportation service from Spring Creek to Westshore, has been the sole provider of rail transportation services from Spring Creek to Westshore since 2008. (Doc. 1, ¶¶ 3, 11–12). NTEC, a Navajo Nation-owned energy company, purchased Spring Creek out of bankruptcy in 2019. (Doc. 1, ¶¶ 2, 10). On December 19, 2022, NTEC filed this action against BNSF, alleging claims for breach of contract and breach of the implied covenant of good faith and fair dealing. (Doc. 1). In its complaint, NTEC alleges that "while BNSF transported more coal trains to Westshore for other export coal producers in 2022 than it had transported in 2021, BNSF dramatically reduced the number of movements that it made to transport NTEC's export coal in 2022," causing NTEC to incur direct financial hardship and damage its reputation for the sale of export coal. (Doc. 1, ¶¶ 37, 43–45).

The facts underlying the dispute are as follows:

BNSF shipped 5.1 million tons of Spring Creek export coal in 2021 under two contracts. (Doc. 1, ¶¶ 11–12, 16). The first contract, Rail Transportation Agreement BNSF-C-12828 ("RTA"), which BNSF entered into with Spring Creek's former owner Cloud Peak Energy, Inc. ("Cloud Peak") in 2018, governed the transportation of coal from Spring Creek to Westshore for sale to a single customer in Japan, JERA Trading Pte Ltd. ("JERA") from November 1, 2019,

2

through March 31, 2023. (Doc. 20-1, at 1). In addition to the RTA, BNSF and NTEC entered into Coal Unit Train Commitment Certificate Number BNSF 90068-0095, which commenced on January 1, 2021, and terminated on June 30, 2021, governing "100% of coal shipped to WS at Roberts Bank, BC in the first half of calendar year 2021." (Doc. 35-1, at 1). The parties extended this second agreement through December 31, 2021, by an amendment dated June 21, 2021. (Doc. 35-1, at 5).

On December 1, 2021, NTEC and BNSF entered into Coal Unit Train Commitment Certificate Number BNSF 90068-0099 ("Certificate") to govern "100% of coal shipped to WS at Roberts Bank, BC in calendar year 2022." (Doc. 20-4, at 3). According to affidavit testimony from Matthew D. Babcock, former manager of international sales and logistics at Cloud Peak and current vice president of sales and marketing for NTEC, these certificate agreements, BNSF 90068-0095 and 90068-0099, were part of "a long line of principal transportation contracts between the Spring Creek Mine owners and BNSF." (*See* Aff. Matthew D. Babcock, Doc. 35, ¶¶ 4–13). The RTA, Babcock asserts, is a "separate and distinct transportation arrangement" that was negotiated and entered into at JERA's request. (Doc. 35, ¶ 17). Babcock testified that the Certificate and the RTA were "mutually exclusive of each other from an operational and commercial perspective." (Doc. 35, ¶ 20).

Several times each year, both the RTA and the Certificate required NTEC to nominate the tonnage of coal it expected to ship under each contract. (Doc. 35, ¶ 22). NTEC entered its forecasted monthly coal shipment volumes in BNSF's coal forecasting tool in an aggregate amount, making no distinction between Spring Creek coal to be shipped to Westshore under the RTA or the Certificate. (Doc. 46-1, ¶ 6). Once the trains were loaded and enroute to Westshore, NTEC sent BNSF a bill of lading for each train, which stated the governing contract for the shipment (the RTA or the Certificate), and noted the train numbers, cars loaded, destination, and other pertinent information for each train. (Doc. 35, ¶ 22). When a train was governed by the RTA, NTEC would specify the bill of lading number as "JERA-BNSF-C-" and the P.O. number as "BNSF-C-12828." (Doc. 35, ¶ 23). When a train was governed by the Certificate, those fields were left blank. (Doc. 35, ¶ 23). At argument, NTEC conceded it had the sole discretion to allocate the coal volumes shipped under each contract.

The RTA contains a "Dispute Resolution" provision, which provides in relevant part as follows:

> If a question or controversy arises between the Parties concerning the observance, performance, interpretation or implementation of the terms, provisions, or conditions herein or the rights or obligations of either Party under this Agreement, such question or controversy shall in the first instance be the subject of a meeting between the Parties to negotiate a resolution of such dispute. . . . The Parties intend that any dispute arising out of this Agreement that cannot be resolved through

4

negotiation as provided above must be resolved through binding
arbitration as provided herein.

(Doc. 20-1, ¶ 30). Specifically, "[t]he arbitration proceeding shall be conducted in accordance with the Commercial Arbitration Rules of the AAA." (Doc. 20-1, ¶ 30). The Certificate neither contains an arbitration provision nor any reference to the RTA. (*See* Doc. 20-4).

On February 2, 2023, BNSF filed the instant motion to compel arbitration and dismiss all claims or, in the alternative, to compel arbitration and stay the proceedings. (Doc. 20). In support of its motion, BNSF argues this case must be adjudicated pursuant to binding arbitration because the parties agreed to submit any disputes arising under the RTA to arbitration and NTEC's allegations necessarily implicate the RTA and aggregate tons of Spring Creek coal moved under both contracts. (Doc. 20, at 6). Additionally, BNSF argues that because the RTA's arbitration agreement delegates arbitrability to an arbitration panel, the panel, and not the Court, should decide whether the scope of the arbitration agreement encompasses the parties' dispute. (Doc. 20, at 14). NTEC argues the dispute does not implicate the RTA because its claims arise solely under the terms of the Certificate, which does not contain an arbitration provision. (Doc. 36, at 12). The Court held oral argument on June 28, 2023. (Doc. 47).

## II.   <u>Legal Standards</u>

When considering motions to compel arbitration, the court applies the summary judgment standard of Federal Rule of Civil Procedure 56. *Theis v. AFLAC Inc.*, 2020 WL 9172984, CV 20-11-BLG-SPW-TJC, *2 (D. Mont. Dec. 28, 2020), *findings and recommendations adopted in full in* 2021 WL 1040588 (D. Mont. 2021). Summary judgment is proper where the pleadings, discovery, and affidavits show there is "no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007).

Courts may consider evidence outside the pleadings for purposes of a motion to compel arbitration because it is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate." *In re Checking Acct. Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014). The party seeking to compel arbitration has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

### III.   **Discussion**

#### A. **The Federal Arbitration Act**

The FAA governs the enforceability of arbitration agreements in contracts involving commerce, "plac[ing] arbitration agreements on an equal footing with other contracts and require[ing] courts to enforce them according to their terms." *Theis*, 2020 WL 9172984, at *2 (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). Section 2, the "primary substantive provision" of the FAA, provides:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy
> thereafter arising out of such contract . . . shall be valid,
> irrevocable, and enforceable, save upon such grounds as
> exist at law or in equity for the revocation contract.

*Rent-A-Center*, 561 U.S. at 37 (quoting 9 U.S.C. § 2). Section 4 permits a party to petition federal district court to compel arbitration "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.

The Ninth Circuit has explained that the court's role under the FAA "is limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Because arbitration is "strictly a matter of consent," *Granite Rock Co. v. Int'l Bhd. of*

*Teamsters*, 561 U.S. 287, 299 (2010), courts apply state contract law to determine whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Additionally, "while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." *Johnson v. Walmart*, 57 F.4th 677, 680–81 (9th Cir. 2023) (citing *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 743 (9th Cir. 2014)).

       *1.  Whether an Agreement to Arbitrate Exists*

The issue before the Court is whether NTEC's claims against BNSF for breach of the Certificate and breach of the implied covenant of good faith and fair dealing are subject to arbitration. The parties do not dispute the validity of either contract, or the existence of a valid arbitration clause in the RTA.[1] (*See* Doc. 36, at 30–31). But while BNSF frames the instant dispute as whether the *scope* of the arbitration clause in the RTA encompasses NTEC's claims (*see* Doc. 20, at 6), NTEC insists that because its Complaint only asserts violations of the Certificate, which undisputedly does not include an arbitration provision, the parties' prior agreement to arbitrate claims arising out of the RTA is irrelevant (*see* Doc. 36, at 8). In other words, NTEC argues that an agreement to arbitrate its claims in this

---

[1] The parties agree that the RTA is a valid contract to arbitrate "JERA issues." (Docs. 20, at 19 n.5; 35-7, ¶¶ 1–9).

case *does not exist*. As a threshold issue, since the existence of an arbitration agreement is disputed, BNSF is not entitled to a presumption of arbitrability at this stage of the inquiry. *Johnson*, 57 F.4th at 680–81.

In determining whether a valid agreement to arbitrate exists in this case, the Court must decide whether the RTA and the Certificate are "'merely interrelated contracts in an ongoing series of transactions' such that the arbitration agreement of the first necessarily applies to the second"; or rather, "the two agreements are separate, each subject to individual interpretation." *Johnson*, 57 F.4th at 682 (holding that because two contracts were separate, independent agreements, an arbitration provision in the first did not encompass disputes arising from the second); *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 340 (9th Cir. 1995) (same). As the Ninth Circuit explained in *Johnson*, where two contracts are "separate," the lack of an arbitration clause means disputes over the agreement are not subject to arbitration; but where two contracts are "merely interrelated contracts in an ongoing series of transactions," an arbitration provision in one contract could apply to subsequent contracts." *Johnson*, 57 F.4th at 682–83.

NTEC relies primarily on *Johnson* to support its argument that the RTA and the Certificate are separate agreements. In *Johnson*, the Ninth Circuit examined whether Johnson's claims concerning his in-store purchase of a tire service agreement were subject to an arbitration provision in Walmart's online terms of

use, to which Johnson consented when he purchased a set of tires from Walmart.com. *Johnson*, 57 F.4th at 680. The court determined the following evidence supported holding that Johnson's service-related claims did not arise out of, or relate to, the online contract containing the arbitration provision: the service agreement was negotiated and entered into separately from the initial tire purchase; the contracts involved separate consideration; and the proof required to establish Johnson's underlying claim for breach of contract depended exclusively on the terms of the service agreement, not the online terms of use. *Johnson*, 57 F.4th at 683. Even though Johnson referenced the original cost of the tires to calculate damages, the fact that he purchased the tires at Walmart.com was merely coincidental to the service agreement he later purchased at the Walmart store; "Johnson would rely on the original value of his tires before he was denied the rotation and balancing services regardless of whether he purchased the tires from Walmart or another retailer." *Johnson*, 57 F.4th at 683.

Likewise, in *International Ambassador Programs*, the Ninth Circuit found two contracts related to travel exchange programs between the United States and Russia were separate agreements because they concerned different types of tours, completely different groups of tourists, and the proof necessary to establish the plaintiff's claims that arose under the contract containing the arbitration agreement

had "nothing to do with" a second dispute, which arose under a later agreement. *Int'l Ambassador Programs*, 68 F.3d at 340.

Here, NTEC points to the plain language of the Certificate and the RTA, which establishes that each contract is, for the most part, mutually exclusive—coal shipments from Spring Creek to Westshore either move under the Certificate or the RTA, but not both; the plain language of the contract provides that the RTA is limited only to JERA coal shipments; the agreements were negotiated separately three years apart; and each contains different essential terms, including different rates and rate adjustment provisions, effective dates, termination dates, minimum and maximum volumes, processes for NTEC's nominations, and consequences for volume shortfalls. (Doc. 36, at 21–22).

However, BNSF counters that unlike in *Johnson*, the two contracts are "closely intertwined" for legal and practical purposes—both involve the same parties, transportation of the same material from the same origin to the same destination, and critically, "adjudicating NTEC's claims and factual allegations will require interpretation of the RTA's provisions" as well as "detailed discovery regarding the parties' performance" under the RTA and the Certificate. (Doc. 46, at 1). The Court agrees with BNSF.

The parties do not dispute that the RTA is a valid contract, or that NTEC is a party to the RTA and bound by the RTA's terms; thus, it is undisputed that the

11

parties formed a valid agreement to arbitrate any disputes "arising out of" the terms of the RTA. Although NTEC argues it does not seek relief in this case based on any provisions, rights, or obligations set forth in the RTA, the allegations in the Complaint are broad.

While it is true that neither contract had any provisions linking it to the other, (Doc. 35, ¶ 25), the Complaint includes factual allegations and damages allegedly linked to BNFS's failure to provide adequate transportation services for all Spring Creek export coal, including shipments ultimately bound for the JERA facility under the terms of the RTA. Repeatedly framing its factual allegations as BNSF's subpar "service to NTEC" regarding "NTEC coal," the underlying facts set forth in the Complaint do not differentiate between JERA and non-JERA coal. For example, the Complaint asserts that "[i]n 2021, NTEC shipped *an aggregate total of 5.1 million tons of Spring Creek export coal via BNSF to Westshore (under BNSF-C-12828 and the 2021 Contract)*." (Doc. 1, ¶ 16 (emphasis added)). Later in the Complaint, NTEC states that "[i]n the 2022 Contract, NTEC committed to the exclusive use of BNSF to ship *all its Spring Creek export coal* to Westshore." (Doc. 1, ¶ 21 (emphasis added). *See also* Doc. 1, ¶¶ 27–33, stating the number of *aggregate* trains per month BNSF transported from Spring Creek to Westshore and claiming, "BNSF's 2022 service to NTEC became substantially more erratic than under predecessor arrangements.").

Finally, though NTEC asserts it is only seeking damages incurred as a result of BNSF's breach of the Certificate, NTEC pleads damages not clearly limited to BNSF's performance under the Certificate, including allegations that because of "BNSF's failure to provide NTEC transportation service," NTEC incurred demurrage charges and "crippling financial hardships," causing it to declare force majeure "under its export coal sales *contracts*." (Doc. 1, ¶¶ 43–46 (emphasis added)). At argument, counsel for NTEC verified that the company's force majeure argument is that NTEC's performance under the RTA is excused due to BNSF's service, and the same service failures that affected NTEC under the Certificate affected NTEC under the RTA.

Operationally, the two contracts are further linked. The undisputed evidence confirmed at oral argument establishes that NTEC's allegations regarding BNSF's failure to provide sufficient service under the Certificate almost certainly require an examination of its performance under the RTA; because BNSF had no operational ability to allocate shipments between the Certificate and the RTA, NTEC had complete control over which contract obligations were satisfied. (Doc. 46, at 4). Further, BNSF initially transported all NTEC shipments under the Certificate as a default, and only after trains departed Spring Creek did NTEC assign particular shipments to the RTA. Despite NTEC's characterization of BNSF's stated lack of control as an attempt to elevate a simple ministerial problem

13

into one that they claim attaches arbitrability to a contract that does not contain an

arbitration clause, NTEC is nonetheless seeking reputational injury and demurrage

damages based on general allegations of poor service, which allegedly required

NTEC to declare force majeure under both of its Spring Creek contracts without

specifying customers or excluding JERA trains from its calculations. Thus, unlike

in *Johnson* and *International Ambassador Programs*, the facts alleged and proof

required to establish NTEC's claims likely require an interpretation of both

contracts and discovery related to all shipments of NTEC coal, including JERA

coal, from Spring Creek to Westshore in 2022.

      Accordingly, because the Court has determined the RTA and the Certificate

are "closely intertwined," a valid arbitration agreement exists between the parties.

The Court now turns to the question of who should decide the issue of arbitrability.

      *2.  Whether the Agreement Encompasses the Dispute*

      Federal law governs the arbitrability question because the dispute is covered

by the FAA and the parties have not clearly and unmistakably designated that

nonfederal arbitrability law applies. *Brennan v. Opus Bank*, 796 F.3d 1125, 1129

(9th Cir. 2015) (citing *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*,

473 U.S. 614, 626 (1985); *Cape Flattery Ltd. v. Titan Maritime*, 647 F.3d 914, 921

(9th Cir. 2011)).

14

As a general rule, the question of arbitrability is "an issue for judicial determination." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). However, the FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). Threshold arbitrability questions can include "whether the parties have a valid arbitration agreement at all, whether the parties are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Rent-A-Center*, 561 U.S. at 68–69 (J. Stevens, dissenting) (internal citations and quotation marks omitted). If there is a valid arbitration agreement, "and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein*, 139 S. Ct. at 529.

The question of who has the power to decide arbitrability requires "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1029 (9th Cir. 2022) (citing *First Options of Chicago*, 514 U.S. at 944 (noting that "the law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a

valid arbitration agreement'—for in respect to this latter question the law reverses the presumption")).

In the Ninth Circuit, incorporation of the AAA Rules "constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130 ("under federal arbitrability law, the Delegation Provision 'clearly and unmistakably' delegated to an arbitrator the question whether the Arbitration Clause was enforceable by expressly incorporating the AAA arbitration rules, one of which provides that the 'arbitrator shall have the power to rule on his or her own jurisdiction'"). A court should compel arbitration of a dispute "only where the court is satisfied that neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue." *Caremark*, 43 F.4th at 1030 (quoting *Granite Rock*, 561 U.S. at 299).

Here, the Court is satisfied that a valid agreement to arbitrate exists between the parties. *See* § III(A)(1), *supra*. Additionally, by incorporating the AAA Rules, the RTA "clearly and unmistakably" delegates arbitrability to the arbitrator. *Brennan*, 796 F.3d at 1130. Therefore, the Court concludes the question of scope, including the agreement's enforceability or applicability to the instant dispute, is for the arbitrator, not the Court, to decide. *Henry Schein*, 139 S. Ct. at 529.

**B. Stay of Proceedings**

Under the FAA, "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration.'" *Rent-A-Center*, 561 U.S. at 689 (quoting 9 U.S.C. § 3). The court may also dismiss an action under the FAA where "[t]he language contained in the arbitration provision is sufficiently broad to bar all of the plaintiff's claims." *Sparling v. Hoffman Const. Co. Inc.*, 864 F.2d 635, 638 (9th Cir. 1988) (quoting *Martin Marietta Aluminum, Inc. v. General Electric Co.*, 586 F.2d 143, 147–48 (9th Cir. 1978)).

Having determined that threshold questions of arbitrability must be addressed by the arbitrator, the Court concludes a stay pending the arbitrator's decision on arbitrability is appropriate in this case. Should the arbitrator determine that NTEC's claims are arbitrable, the parties may move to dismiss this action upon completion of the arbitration process. *See Theis*, 2020 WL 9172984 at *6.

**IV.   <u>Conclusion</u>**

Accordingly,

IT IS RECOMMENDED that Plaintiff's motion to compel arbitration on the threshold issue of arbitrability be GRANTED and the proceedings STAYED until the arbitrability issue is resolved.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 24th day of July, 2023.

Kathleen L. DeSoto
United States Magistrate Judge